**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| Plaintiff | : | |
| | : | Criminal Case No.: CR-07-161-01 |
| *v.* | : | Sentencing: January 10, 2008 |
| | : | |
| **ANDREA MYLES** | : | |
| **AKA: ANDREA RILEY** | : | |
| | : | |
| Defendant | : | |

.................................................................................................................................

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The Defendant, **ANDREA MYLES AKA: ANDREA RILEY** (hereinafter "Andrea Riley"), by and through her attorney, Clark U. Fleckinger II, respectfully submits this memorandum in order to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of sentencing, as required by 18 U.S.C. §3553(a), and in light of *United States v. Booker*, 530 U.S. 220, 125 S. Ct. 738 (2005).

**I.      Background**

In the summer of 2000 Andrea Riley was hired as a secretary for the law firm of Alvord & Alvord located in the District of Columbia.  The principal of that firm was Robert Alvord.  In her capacity as the secretary to the firm generally, and to Mr. Alvord specifically, she had access to various the various bank accounts of the firm and was responsible for, among other things, making deposits and paying bills (including her own payroll) into and from those accounts as well as reconciling the same.

As has been proffered in the Statement of Offense which was made a part of the record pursuant to the plea proceedings of July 2, 2007, during the course of her

1

employment at Alvord & Alvord, and in addition to the legitimate payment of her wages, Ms. Riley began fraudulently diverting the funds of the various bank accounts of Alvord & Alvord and/or the Alvord Foundation to either herself or to third parties for her benefit during the summer of 2002.   At the end of 2005, her employment at Alvord & Alvord was terminated as a result of Robert Alvord having become aware of her conduct.[1]

In the spring of 2006, a detective from the Metropolitan Police Department contacted Ms. Riley and requested that she provide information regarding the Metropolitan Police Department's investigation of Ms. Riley's diversion of Alvord & Alvord funds. Through counsel, Ms. Riley declined the invitation to speak with law enforcement at that time.   However, shortly thereafter, and in the spring of 2006, counsel for Ms. Riley contacted Mr. Alvord in an attempt to resolve, without making any admissions which might result in criminal liability, any civil liability (*i.e.,* restitution) of Ms. Riley to Mr. Alvord and/or Alvord & Alvord.  Mr. Alvord declined to enter into any such discussions. Shortly thereafter, and contrary to the advice of counsel, Ms. Riley contacted Mr. Alvord by e-mail and apologized to Mr. Alvord for her conduct and indicated that she would reimburse him the monies at issue.  Mr. Alvord did not respond to Ms. Riley's e-mail.

In April of 2007, undersigned counsel was contact by AUSA Perham Gorgi of the United States Attorney's Office who was conducting the Government's investigation of the aforesaid.  After the review of a substantial amount of pre-charging discovery, Ms. Riley waived her right to be indicted by a Grand Jury and, as previously noted, pled guilty to an Information charging her with Bank Fraud on July 2, 2007.

---

[1] The details of her conduct have been proffered in the Statement of the Offense to which she admitted which were, thereafter, incorporated into the Presentence Report   Accordingly,  those details will not be reiterated herein.

**II.    Objections and Comments to Presentence Report and Guideline Calcuation**

The Presentence Report was completed on October 3, 2007 following a draft of the same after which the parties had an opportunity to comment and/or object.  Ms. Riley will address hereinafter the *unresolved* comments and/or objections referenced in the Addendum to the PSR commencing at Page 19.

The first unresolved comment and/or objection references Ms. Riley's objection to Paragraph 8 with regard to her name.  Ms. Riley recognizes that the Information filed by the Government to which she pled guilty was filed as the *United States v. Andrea Myles.* However, as indicated by undersigned counsel at the time of her plea on July 2, 2007, and as referenced in undersigned's comments and objections to the PSR, Myles was Ms. Riley's married name.  In 2005 she divorced and resumed her maiden name of Riley.

The second unresolved issue as referenced in the Addendum is the objection noted to Paragraphs 11 and 14 of the PSR which quoted undersigned counsel's objection which, in essence, indicated that Ms. Riley had taken no affirmative action to obtain the debit card which she acknowledged have used without authority.  Although noting the objection, the PSR writer made no amendment to Paragraphs 11 and 14 because Ms. Riley agreed to the factual proffer.  However, Ms. Riley would submit that her objection does not contradict the factual proffer.

The third, and primary, unresolved issue referenced in the final draft of the Presentence Report is whether a two (2) level upward adjustment should be applied to the

guideline calculation pursuant to USSG § 3B1.3 as a result of an alleged Abuse of Position of Trust.   Ms. Riley objects to the 2 level upward adjustment for Abuse of Position of Trust or Use of Special Skill pursuant to that guideline.   USSG § 3B1.3 applies if the defendant abused a position of public or private trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense. [2]   Application Note 1 provides that the definition of a "public or private trust" refers to a position of public or private trust is characterized by *professional or managerial discretion*  (emphasis added) . The definition applies to *positions* which are occupied by persons who generally are accorded substantial discretion which is necessary to carry out to the various duties of the professional or managerial position and under circumstances where the exercise of such discretion is accorded considerable deference.   The definition further provides examples of the kinds of positions to which this guideline does and does not apply.   The guideline applies to a lawyers, bank executives, or physicians who abuse a client, the bank or its investors, or a patient.   Such persons are professionals and/or managers who typically act with little supervision and to whom substantial discretion is typically accorded in order to properly carry out the duties of those positions.   However, as the same Application Note further indicates, the guideline *does not apply* in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the previously referenced factors which give rise to application of the

---

[2]The PSR writer is not taking the position that Ms. Riley is subject to application of USSG §3B1.3 as the result of having a special skill.   Accordingly, undersigned counsel will not address in the text of this memorandum application of the "special skill" aspect of that guideline other than to note that Application Note 4 would appear to make clear that a law firm bookkeeper/secretary does not possess the kind of "special skill" which would implicate this guideline.  Pursuant to that Application Note, such a skill is not that kind of skill which is possessed by the general public.  Rather, it is a skill acquired through substantial education, training or licensing.  Examples of the kinds of skills referenced by this guideline are those skills possessed by pilots, lawyers, doctors, accountants, chemists and demolition experts.  Ms. Riley submits that a bookkeeper/secretary clearly does not fall within that category of occupations to which that aspect of the guideline applies.

guideline.  A law firm bookkeeper/secretary, typically under the supervision of an employer/attorney and is, as a general proposition, without substantial discretion when carrying out his or her duties.  Accordingly, Ms. Riley submits that law firm secretary/bookkeeper is substantially more akin to a bank teller than to a lawyer or other professional.

Ms. Riley would further submit that the case law of the D.C. Circuit would support Ms. Riley's submission that USSG § 3B1.3 does not apply to a person who commits a fraud crime against her employer while working as a bookkeeper/secretary for that employer.  Specifically, in *United States v. Smaw,* 306 U.S.App. D.C. 21, 22 F.3d 330 (D.C. Cir. 1994) (*Smaw II*), the Court held, and made clear, that the guideline does not apply to a federal agency "time and attendance clerk" who fraudulently obtained credit cards by accessing the names and personal data of fellow employees did not occupy a position of trust as envisioned by the guideline *because* she lacked the requisite "professional or managerial discretion."   Similarly, in reliance upon *Smaw (II),* and for the same reasons, the D.C. Circuit held in *United States v. West,* 312 U.S.App. D.C. 252, 56 F.3d 216 (D.C. Cir. 1995), that the guideline should not be applied to a courier who, in his capacity as a courier, was entrusted with checks and keys which permitted him access to the checks in question and lockboxes containing documents necessary to carry out his fraudulent scheme.[3]   In so holding, the *West* Court commented on its reliance on *Smaw II* by writing "[t]his court thus made clear that the commentary's focus on positions characterized by professional or managerial discretion places a significant limit on the types of positions subject to the abuse of trust enhancement."  *Id,* F.3d at 220.  Moreover,

---

[3] Interestingly, while distinguishing between the courier and the time and attendance clerk in *Smaw,* the dissent in *West* characterized the position of the time and attendance clerk as that of a secretary.  *West, supra,* 56 F.3d at 222 (Wald, J., dissenting).

when commenting on the Government's theory as to why the enhancement should apply, and again relying on *Smaw (II),* the *West* Court wrote "[i]ndeed, the Government's theory would approach the danger that we noted in *Smaw II* 'of converting the position of every person who handles property into one of trust.'"  *West,* F.3d at 221. Thus, in the cases which the D.C. Circuit has considered which are most analogous to the facts in the case at bar, the D.C. Circuit would clearly appear to support Ms. Riley's position. [4]

For the foregoing reasons, Ms. Riley submits that the two (2) level upward adjustment to the Offense Level Computation as referenced in Paragraph 26 should be stricken.  If the Court strikes the two (2) level adjustment, the Paragraph 28 Adjusted Offense Level (Subtotal) of 21 should be amended such that the Adjusted Offense Level (Subtotal) should be 19 and the Total Offense Level of 18 referenced in Paragraph 31 should be 16.  Such amendments would further impact Paragraph 67 such that the guideline range of imprisonment would become 21 to 27 months.  Similarly, Paragraph 80 which references a minimum guideline fine should be amended to $5,000 rather than the $6,000 referenced in Paragraph 80.

---

[4] Ms. Riley is aware of the D.C. Circuit's holding in *United States v. Becraft,* 326 U.S.App. D.C. 100, 117 F.3d 1450 (D.C. Cir. 1997) which held that an office manager of the Institute of International Economics, who later assumed responsibilities as the marketing director, was subject to the USSG § 3B1.3 enhancement because of, *inter alia,* the complete trust that the Institute's deputy director had actually reposed in the defendant.  Accordingly, because Ms. Riley's employer may have reposed an abnormal amount of trust in Ms. Riley who was working as his secretary, undersigned counsel anticipates that the Government will cite to *Becraft* in order to support the position of the PSR writer that the enhancement should apply.  However, Ms. Riley would respectfully submit that the defendant in *Becraft* was, in fact, working in a managerial capacity and, thus, subject to the enhancement for that reason alone.  Moreover, the *Becraft* Court recognized that the defendant was only "under the *nominal* supervision of the Institute's deputy director", *Becraft,* F.3d at 1452.  Ms. Riley further submits that the fact of reposing abnormal trust in a person who holds a position which is not normally associated with such trust, or an employer's failure to exercise a degree of supervision over a position which would typically require such supervision, should not elevate the position to a position of trust which was not envisioned by the guideline itself.  *See, Becraft,* 117 F.3d at 1453-54 (Ginsburg, J. dissenting) ("We have previously cautioned that expanding the range of positions 'characterized by professional or managerial discretion' may render the term 'so boundless as to be meaningless.'  … I fear that today's decision will have just that effect; henceforth, the operative question will no longer be whether the defendant occupied a position 'characterized by professional or managerial discretion …,' but instead whether the defendant, regardless of the nature of his or her position, was closely supervised.  Because that is not what the Sentencing Guidelines require, I respectfully dissent.") (citations omitted.)

The fourth "unresolved" issue which was made the basis for an objection to the initial draft of the Presentence Report relates to whether Ms. Riley was suffering from any mental health disorder which contributed to her conduct.  Reference is made to Paragraphs 38,[5] 44, and 45.   In that regard, Ms. Riley apparently made no initial reference to any instances of abuse during her life and, further, apparently advised the PSR writer that she suffered from a compulsive shopping disorder for which she was then seeking treatment. In fact, Ms. Riley does not appear to suffer from such a disorder nor is she currently in treatment.   Nevertheless, a forensic psychological evaluation of Ms. Riley has been undertaken by Mitchell H. Hugonnet, Ph.D., a clinical and forensic psychologist.  Dr. Hugonnet's evaluation is attached hereto as Exhibit 14.   Although Dr. Hugonnet was unable to identify or diagnose any acute or chronic abnormal mental state which contributed to her criminal conduct, it is worthy of note that Dr. Hugonnet has diagnosed Ms. Riley as suffering from mild Posttraumatic Stress Disorder (PTSD) stemming from, *inter alia,* a history of sexual and physical abuse.  His evaluation further suggests that, as a result of that condition, Ms. Riley's judgment can become impaired at times and that she is vulnerable to behaving in an impulsive and self-destructive manner which is likely to be aggravated by a significant period of incarceration which is, therefore, likely to impact her income producing capability.

The fifth comment referenced in the final PSR and which will be addressed herein is that contained on P. 21 of the PSR which references potential third party risk that Ms. Riley presents to her "current" employer.  That issue is now moot – at least as to her "current" employer.   At the time of Ms. Riley's comments and objections to the initial

---

[5] When noting Ms. Riley's various objections, the final draft of the PSR refers to statements of Ms. Riley in Paragraph 37 of Page 21.  It would appear, however, that the statements referenced are actually contained in Paragraph 38.

draft of the PSR, and at the time of the final draft of the PSR as referenced in Paragraph 51 of the same, Ms. Riley was employed at Gannet Co., Inc. as an administrative assistant to the Vice-President and Treasurer of the company and earning $48,000 per year.[6] However, Ms. Riley is no longer employed at Gannett.   On October 26, 2007 she was terminated from that employ.[7]   She is unclear as to the reason for her termination inasmuch as she believed, based upon comments by supervisory personnel at Gannett, that her performance was satisfactory.  She believes that the reason for her termination was that Gannett personnel may have learned of the instant offense for which she is due to be sentenced although she has no proof of that belief.  In any event, Paragraph 51 should be amended to reflect the change noted above.

In regard to the requested amendment to Paragraph 51 as just noted, Ms. Riley is currently working seven (7) days a week between 4:00 PM to midnight as a hostess at a restaurant known as Peaches Café and Lounge located in Upper Marlboro, Maryland.  She began work there on October 29, 2007 – 3 days after termination of her employment at Gannett.  Her hourly wage is $8 per hour and, accordingly, she is earning approximately $448 gross, per week, based upon 8 hour work days.   In addition, for approximately 3 days per week, Ms. Riley is tending bar at that same location.  Her income for bartending is based upon tips.  Obviously, her tip income fluctuates.  However, she estimates that she is netting approximately $2,000 per month based upon both hourly hostess income and tip income.[8]   Accordingly, in addition to updating the information contained in Paragraph 51

---

[6] In that particular comment and objection to the PSR, Ms. Riley suggested that the PSR writer's concern about the risk presented by Ms. Riley to her employer was overstated and, in any event, could be addressed by, *inter alia,*  submission of an annual review.

[7] Ms. Riley was, technically, not terminated.   Rather, she resigned so that she could receive a 2 week severance pay.  However, she would have been involuntarily terminated had she not chosen the option just referenced.

[8] Ms. Riley anticipates that she will be promoted to floor manager for the restaurant and that that promotion will occur in the relatively near future.  If the promotion occurs as anticipated there will be an increase in her

of the PSR with regard to her current employment, Paragraph 57 which reflects net income of $2,844 should be amended to reflect her actual (but estimated) current income. Similarly, her net monthly cash flow referenced in that same Paragraph should be amended as well.

Paragraph 57 also references $560 held in escrow. In fact, at the time of the preparation of this Sentencing Memorandum, there is $1,560 held in the escrow account of undersigned counsel. That account was commenced for the specific purpose of accumulating funds for the initial restitution payment to Mr. Alvord. Further, Ms. Riley advises that on December 29, 2007 she forwarded a $1,000 money order payable to undersigned counsel for placement into the aforesaid escrow account for the benefit of Mr. Alvord. Accordingly, undersigned counsel anticipates that, at the time of the January 10, 2008, sentencing in this matter, there will be at least $2,560 held in escrow for the benefit of Mr. Alvord. Additionally, however, Ms. Riley anticipates that retirement benefits in the amount of $1,523.34 which were earned while she was employed at Gannett will become available to her in the very near future. Those benefits are evidenced by the Gannett 401(k) Savings Plan Confirmation of Payment attached hereto as Exhibit 15.[9] Accordingly, it would appear that, at the time of sentencing, Ms. Riley will have been able to escrow $4,083.34 toward her restitution obligation to Ms. Alvord. Paragraph 57 should be amended accordingly.

---

hourly wage although the amount of the increase is unknown. In addition, since termination of her employment at Gannett, Ms. Riley has made herself available for employment through various temp agencies which she hopes will lead to fulltime employment using her secretarial skills. Thus far, she has not received any temp jobs which would give her that opportunity.

[9] Undersigned counsel recognizes that the referenced Exhibit indicates that the payment was, in fact, already made. Ms. Riley advises that, in fact, it has not yet been paid and that when she spoke with personnel of Gannett on December 28, 2007, such personnel advised that a check in that amount should be forwarded shortly.

### III.    Non-Guideline Sentencing Factors To be Considered

As the Court is well aware, because the mandatory nature of the Federal Sentencing Guidelines is incompatible with an accused's Sixth Amendment right to a jury trial and to, thereby, have a jury determine the facts necessary to support the "statutory maximum" sentence which a court may impose as per the holding of the Supreme Court's *constitutional* majority in *United States v. Booker, supra,* the Supreme Court's *remedial* majority in *Booker* excised that portion of the Sentencing Reform Act of 1984 as contained in 18 USC §3553(b) which made application of the guidelines mandatory.  Per *Booker,* the guidelines are now advisory only.  Accordingly, the guidelines are now only one of several factors, pursuant to the dictates of §3553, which the Court must consider when imposing a sentence which is, as per the dictate of §3553, "sufficient, but not greater than necessary" to comply with the purposes set forth further in that statute.[10]    Nevertheless, and as addressed in Section II of this Memorandum, it is necessary that the guidelines be calculated accurately.   That is for the reason that an inappropriately aggravated guideline calculation is likely to improperly, and adversely, skew the other various sentencing considerations to be taken into account by the Court.

The *non-guideline* factors to be taken into account pursuant to the dictates of §3553 are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, 18 USC §3553 (a)(1); as well as, pursuant to sub-section (a)(2) the need for the sentence imposed:  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D)

---

[10] In fact, Ms. Riley would submit that all of the other sentencing factors referenced in §3553 are subservient to §3553(a)'s overarching mandate that a sentence be sufficient, *but not greater than necessary,* to comply with the statutory purposes of sentencing.

to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Moreover, and pursuant to 18 USC §3553 (a)(3),  (5),  (6) and (7) the kinds of sentences available, any pertinent policy statement (A) issued by the Sentencing Commission…, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and the need to provide restitution to any victims of the offense. [11]

### IV.    Consideration of Other §3553(a) Sentencing Factors and Suggested Sentence

As has been noted in the PSR, Ms. Riley is the, now 37 year old, divorced mother of two (2) daughters and the grandmother of a young granddaughter for whom she is, and always has been, the primary financial support.[12]   She has lived in the metropolitan area her entire life and graduated from public high school in Prince George's County, Maryland but did not go beyond that educational level.   Nevertheless, she clearly has various secretarial skills[13] and has attempted to enhance her vocational skills in order to maximize her income producing capability by attending culinary classes, real estate classes, and bartending classes.[14]  She has also tried earning income as a sales representative for a skin care company.  She has been employed for virtually her entire adult life and recognizes the value of work.  As evidenced by her refusal to ask her first husband for financial support for the benefit of her children, and her refusal to seek financial assistance from the

---

[11] Ms. Riley would also note that,  pursuant to 18 USC §3582(a), when a sentencing court is assessing whether to impose a sentence of incarceration, or the length of incarceration if a sentence of incarceration is to be imposed, "imprisonment is not an appropriate means of promoting correction and rehabilitation." *Id.*

[12] She was also the sole financial support during the course of her second marriage to Richard Myles.  That marriage existed during the course of the criminal conduct for which Ms. Riley is due to be sentenced.

[13] Undersigned counsel would submit, on information and belief, that Robert Alvord would attest to the secretarial skills of Ms. Riley.

[14] *See,* ¶48 of the PSR.

government,[15] she has always attempted to financially provide for her family while maintaining her independence.  During the course of her employment with Alvord & Alvord, those characteristics were the impetus of her criminality.  Prior to the instant offense, she had never been convicted of a criminal offense other than a 2004 traffic citation.

Attached hereto as Exhibits 1 through 13 are various letters which have been written by family and friends of Ms. Riley who have come to know Ms. Riley over many years.   The person that they describe is a church going, warm, generous, and loving woman who has tried to set good example for her children, her family, and her friends in her pursuit of the American dream.  She has tried to be a mentor and an example to, not only her own children, but other adolescents and young adults who she perceived needed the guidance of an adult.   Those letters also convey a sense of surprise at the criminality of Ms. Riley but, moreover, they convey a sense of the shame, embarrassment and remorse which Ms. Riley now expresses to both the Court and to her former employer, Robert Alvord.[16]

The sense of surprise expressed in those letters begs the question which this Court is undoubtedly trying to answer in order to appropriately sentence Ms. Riley pursuant to the dictates of *Booker* and its progeny as well as the dictates of 18 U.S.C. § 3553 (a). What was Ms. Riley thinking when she diverted the monies of her employer over an extended period of time?

The answer to that question is somewhat difficult to answer.  Her conduct commenced when she asked her employer for an advance on her salary which was

---

[15] *See,* ¶39 of the PSR.

graciously granted. But, notwithstanding the advance, she got paid (again) during the normal course. As with many people, she was financially overextended and, telling herself that she would pay the money back, used the extra money to pay bills. Because of lax supervision, she didn't pay the money back and she did it again. Over the months and years she took advances, she paid third parties for her benefit, and she used the firm's debit card for her benefit. By the time her theft was discovered, she was shocked at the amount that she had taken over the years. At the inception of her criminal conduct, it was her intent to pay the money she was diverting for her benefit back to Mr. Alvord and/or the firm and/or the Alvord Foundation. Her diversion of Alvord & Alvord and the Alvord Foundation funds didn't start out with a criminal mind set. She, like so many, was pursuing the American dream, a better life for herself and her family. She sought a life that she saw other people living but that she could not afford. When the opportunity for easy income arose she succumbed to the temptation. Clearly, even if it wasn't there at the outset, at some point in time she recognized her criminality. By that time, undersigned counsel would suggest that her impulsivity, referenced by Dr. Hugonnet, was out of control.[17]   She didn't stop until she was caught in the latter part of 2005.

As noted previously, the Metropolitan Police Department commenced an investigation in the spring of 2006 and, pursuant thereto, contacted Ms. Riley who contacted undersigned counsel. Undersigned counsel contacted the investigating detective and, in order to limit Ms. Riley's exposure to criminal sanctions, undersigned counsel

---

[16] In August of 2007, undersigned counsel wrote Mr. Alvord indicating that Ms. Riley (with undersigned counsel) would like to meet with him in advance of sentencing in order to express her shame and contrition to him personally. Mr. Alvord, understandably angry, declined the invitation.

[17] Undersigned counsel recognizes that Dr. Hugonnet was unable to determine to a reasonable medical certainty that Ms. Riley's criminality was related to a mental health disorder. Nevertheless, undersigned counsel would suggest that, to some extent, such impulsivity may have contributed to her thought processes at the time and should be considered, to whatever extent the Court deems relevant, pursuant to 18 U.S.C. § 3553 (a) (1).

advised that Ms. Riley was unwilling to make a statement to the detective with regard to that detective's criminal investigation. Nevertheless, upon the urging of Ms. Riley, and with her acquiescence, undersigned counsel contacted Mr. Alvord in an attempt to enter into an arrangement of restitution. Mr. Alvord declined to enter into such discussions. Ms. Riley subsequently contacted Mr. Alvord by e-mail, on her own, and requested that he permit her to pay him back whatever it was that she diverted from him, the firm, and the foundation. The plea bargain requires her to make such restitution.

The import of the foregoing is that, early on, Ms. Riley recognized the impropriety of her conduct and wanted to make restitution. Her desire continues in that regard as evidenced by her having escrowed the monies previously referenced for that purpose. There is a long way to go, however, before her obligation is complete in that regard. She wants to see that obligation through. Continued employment and production of income is the only realistic way that such an obligation can be realized.

Although, and as previously noted, imprisonment is not an appropriate means of promoting correction and rehabilitation, Ms. Riley recognizes that a non-mandatory guideline calculation of imprisonment is a factor which the Court should consider for legitimate reasons which relate to, *inter alia,* the need to provide both general and specific deterrence and to protect the community from similar acts of the defendant to be sentenced. Obviously, a sentence of imprisonment is likely to have a deterrent effect and would certainly protect the community from the defendant during the period of imprisonment. However, a sentence of imprisonment at a Bureau of Prisons facility is also likely to adversely impact what undersigned counsel would suggest is a more important sentencing consideration in the context of the case at bar. Specifically, a sentence of incarceration at a Bureau of Prisons facility will prevent Ms. Riley from

working during the period of the imprisonment which will have the impact of preventing her from making restitution payments during that period of imprisonment.  Moreover, her chances of becoming and remaining gainfully employed following release from a sentence of imprisonment will be substantially reduced simply by virtue of her having to explain her absence from the work force when reentering the same upon her release, an explanation which will, understandably, deter potential employers.  The consideration of her ability to comply with her restitution obligation pursuant to the plea bargain is as important as any other sentencing consideration and is mandated by 18 U.S.C. § 3553 (a) (7).

As to other relevant sentencing considerations, Ms. Riley would respectfully submit that this prosecution alone, the law enforcement investigation which preceded it, and the very real prospect of a period of a sentence of imprisonment, has already had the effect of specifically deterring Ms. Riley from similar conduct in the future.  As evidence of that proposition, no such similar larcenous conduct has occurred since the termination of her employment two (2) years ago.  And, as a related matter, the absence of such criminal conduct during that time evidences the fact that community protection is a non-factor when determining what sentence should be imposed which serves the overriding statutory purpose of imposing a sentence which is "sufficient but not greater than necessary" as required by 18 U.S.C. § 3553 (a).

Ms. Riley would submit that a sentence, which still imposes a significant restraint on her liberty, but which is also short of imprisonment, followed by supervised release, is a sentence which satisfies the sufficient but not greater than necessary statutory dictate and promotes the various factors which should be taken into account at the time of sentencing.  Home detention through electronic monitoring accomplishes such goals.   If such a sentence is imposed, employment can be maintained and restitution payments can be

continued.   Further, it increases the likelihood of maintaining gainful employment (as opposed to seeking new employment when released from the Bureau of Prisons) for restitution purposes, as well as in order to permit Ms. Riley to provide continued support for her children and her grandchild.   She submits that such a sentence does nothing to undermine the deterrent effect of sentencing.   Neither does such a sentence, which still substantially restrains her liberty, undermine the statutory need for the Court to underscore, to Ms. Riley, the community, and to Mr. Alvord, the Court's recognition of the seriousness of the offense for which she is being sentenced.

For the foregoing reasons, Ms. Riley submits that a sentence which requires any restraint on her liberty be one which permits such restraint through electronic monitoring.

Respectfully submitted,

_____/S/_____
Clark U. Fleckinger II
Attorney for Defendant
Rockville Metro Plaza I
111 Rockville Pike, Suite 980
Rockville, MD 20850
(301)294-7301
Bar No. 362393

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Defendant's Memorandum In Aid of Sentencing, has been served, by ECF and by first class mail, postage prepaid, upon AUSA Louis Ramos at the United States Attorney's Office, located at 555 4th Street, NW, Washington, D.C. 20530, this 3rd day of January, 2008.

_____/S/_____
Clark U. Fleckinger II



July 9, 2007

The Honorable Gladys Kessler
of the U.S. District Court for the
District of Columbia

My name is Gerri Lamia Cooper and Andrea and I have been good friends for over 15 years. We met through our children fathers (which are cousins) and in time realized we had a lot in common. We both have two kids in the same age range, so we participated in outings with the kids on a regular basis, taking family trips and spending a lot of time visiting each other.

We both have had our share of not being employed and struggling to make ends meet. We took on temporary assignments and as always Andrea was so dedicated to her work which led her to being brought on permanent in no time. She comes in the door ready to take on whatever responsibilities they have for her.

Andrea is a caring and loving person, she has the persona of an Angel and the spirituality to uplift you. She has dedicated her time to raising her two girls (as well as other children needing that parental guidance) keeping them in different activities, very thorough about encouragingtheir education and her personality expresses she is outgoing and full of drive, very muchmuchmuch a people person and doesn't mind taking on different challenges as they may be.

I don't know what personal issues Andrea may have gonegone through duringduringduring this time. ButI do know that is not her usual character or demeanor. Andrea always loved working for the firm and worked very hard while she was there. She has expressed to her family and friends not only the remorse but the embarrassment of her actions and knowing her spirit as well as her heart, I assure you, she means it when she said she apologizes (truly sorry) for her actions.

Sincerely,

*Gerri L. Cooper*

Gerri L. Cooper
6535 Hil Mar Drive
Apt. 103
Forestville Maryland 20747
(301) 735-1506



DEFENDANT'S
EXHIBIT
2

July 9, 2007

The Honorable Gladys Kessler
U.S. District Court for the District of Columbia

Re: Character Reference for Andrea Riley

I have known Ms. Riley for over twenty years. She belongs to the same church that I do, Sargent Memorial Presbyterian Church, 5109 Burroughs Ave. NE, Washington, DC.  I have had a chance to work with Ms. Riley in many capacities, as a young mother, as a musician and in many aspects of church work. She is talented, hard working, pleasant and enthusiastic. As a result, she often spearheads church activities. For example, she led our teen choir for over a year while the church was looking for a permanent director. She has raised two girls into adulthood and the church has been blessed by the entire family. If there is anything that I can do for Ms. Riley, I will do it. She has been the kind of individual that others would want to extend themselves for.

If you want to contact me personally to further attest to Ms. Riley's character, I welcome the opportunity to do so,

*Marilyn E. Gross*

Marilyn Gross
6603 Asset Drive
Landover, MD  37208
(301) 336-1734

DEFENDANT'S
EXHIBIT
3

July 11, 2007

Phil-am Marie Fant
6353 64th Avenue #C6
Riverdale, MD 20737

Dear Judge Kessler;

I am a wife and a mother of four beautiful children. I have been employed with the Epilepsy
Foundation for the past two years and the National Mental Health Association 6 years before
then. I have done a lot of advocacy work through the Sexual Assault Center and the Family
Crisis Center. I am only stating this just to give you an idea of what I am accustomed to in
my life. I have been in the non profit field for almost 10 years and that dealt with helping
other people besides me. I met Andrea Riley in May of 2006 through a part time job that was
necessary for the both of us to have at that point of our life. Through this employment
opportunity I was able to become friends with Ms. Riley. I can say that she was a definite
godsend to me since I was going through a difficult time in life. I had just got married in
January and my husband and I were already having problems so my solution was to pick up a
second job to get my mind off of the misery at home. I enjoyed coming to work at my part
time job since it was a live establishment and I was able to meet a lot of interesting friends
and people. The 6 months that I worked there Ms. Riley's friendship was a necessity to my
livelihood since she herself has gone through a divorce so she was able to share some advice
that become very important to me healing my newly found marriage. She showed me that life
was more than just saying that I was a married woman, but to live the experience that
marriage was a beautiful thing that I had to cherish in my life. At the time I didn't believe
that my marriage could last but after seeking her advice and actually doing the things that
made sense saved me from experiencing a nasty divorce and child support with my husband.
I know the person that I met in April of 2006 could not possibly be the same person that had
done the unspeakable act of a criminal offense. Her passion for life and her love for her
family earned her respect in my eyes and love in my heart. I would not think a woman of
God as herself would even allow herself to be put back into that situation. I only ask that you
give her a second chance in life as her words of wisdom have given me and my family. We
have remained close friends since then; almost sisters. So please take this into consideration
when you decide her fate.

Sincerely,

Phil-am Marie Fant



DEFENDANT'S
EXHIBIT
4

July 11, 2007

The Honorable Gladys Kessler
U.S. District Court for the District of Columbia

  This letter is to speak on Andrea Riley. I understand the seriousness of the situation and what I say will be 100% honest.

Andrea, from the day I've met her, has always been a person with the best intent in her heart. She's always been kind and generous to her fellow man. We were married for close to 15 years and were raising two young kids. We had a beautiful four bedroom home as well as the luxuries of living the American dream. I can't speculate on the financial burdens that took place upon us getting divorced but I know she refused to allow our kids to be without.

I can't say why things took the place they did but I know that being a single parent and raising two growing children could have played a part in what happened. Our oldest child soared throughout her entire school years. She was in the "talented and gifted" (TAG) program from elementary all the way to her twelfth grade year. She did her best to see that our kids stayed focused and kept financial difficulties out of their thoughts. I can't pin point why it happened.

*James Harrington*
*4451 Parliament Place, Suite K Lanham, Maryland 20706*
*Phone (301) 459-2679 Fax (301) 459-7025*
*Web Address: www.trctranet.com*
*E-Mail's: jamesh@trctranet.com Production: trc@trctranet.com*



I know she has the heart of a strong woman. A heart of a good mother as well as devoted parent that made sure the kids was in church every Sunday. Can it be repeated? All I can say... I have two kids with her that has made it through the first step. School is over and the focus is now on the life lessons given to them by us to go out into the world and try to be as successful as they can be.

The burden of making sure they are taken care of is now on them. They are two beautiful young women and their mother did her best to offer them the best. That's my only thought that may have played a part in what has occurred. Will she repeat it? I say no because our "birds are flying" the nest. They both are in the work force as well as prepping to attempt some addition schooling.

Andrea has never been a criminal to me. She was a great mom and a good friend once we were divorced and I hope what I have said shows a side to her character that hasn't come to light. I wish her all the luck.

Sincerely,

James Harrington
(240) 508-5383

*James Harrington*
*4451 Parliament Place, Suite K Lanham, Maryland 20706*
*Phone (301) 459-2679 Fax (301) 459-7025*
*Web Address: www.trctranet.com*
*E-Mail's: jamesh@trctranet.com Production: trc@trctranet.com*

DEFENDANT'S
EXHIBIT
5

Honorable Gladys Kessler, U.S. District Court
Of the District of Columbia


Honorable Judge Kessler~

I have known Andrea about 2 years now and our relationship was built during her process of pursuing her career in becoming a Real Estate Agent. As well as our friendship, I am also mentoring her to become a Realtor for the State of Maryland.

She was in the process of taking classes when the current situation presented itself, causing her to have to redirect her focus. Miss. Riley is very anxious to become a realtor; she presents the drive and initiative to fulfilling that opportunity. She shows much compassion in her current situation and from the years of our friendship she has not revisited or even partaken in activity such as her past.

She has shown me in many ways, in my life, how to deal with personal issues as well as my career demeanor, and how much of a blessing I am to myself, but more importantly the benefit of others that share in my fulfillments.

Andrea is very driven to succeed, she possess understanding, ingenuity, compassion, her spiritual strength is phenomenal and she is definitely a positive role model for myself, others and overall for her children.

Joanne George



August 2, 2007

**The Honorable Gladys Kessler**
**Of the U.S. District Court for the**
**District of Columbia**

**Re:    Character Reference**
**Andrea Riley**

Hello, I am righting this character reference on behalf of Andrea Riley, a dear friend of mine for nearly two decades. When I met Andrea, we were in our early twenties. I was single and without children, and Andrea had two beautiful little girls. Unlike many women our age, Andrea did not leave any of her parenting responsibilities up to anyone else. Most times she was on her own and she did whatever it would take to make sure her children always went to the best schools, lived in respectful neighborhoods, and were raised to respect themselves and others. The girls are now beautiful and productive young women. Andrea's successful children are a testament to what are truly, her very own, core values.

One thing about Andrea is that no matter the circumstance, she always appeared to stay strong and to gracefully weather life's storms. She never appeared to allow her challenges, disappointments, and life's failures to get the better of her. I now look upon her current circumstance and see that perhaps she was not as strong as she appeared. Over time, it became more difficult for her to maintain the status quo alone. And, I believe it became essential, to Andrea, that she never be viewed by others to have become the stereotypical, single, struggling black woman with children who was always looking to others for a help. Perhaps among other things, this influenced Andrea, an otherwise trustworthy and good person, to make this serious mistake.

Andrea is embarrassed, disappointed in herself, and now, very aware of how her actions are continuing to effect everyone else. She is truly remorseful, understands the seriousness of what she has done, and is learning a very hard lesson. Andrea expressed to me that she truly regrets her actions and is 100% accountable.

If Andrea could be given a chance to reasonably atone for her debt, receive counseling, and seek out a mentor, I believe she would become a valuable life-line for other struggling single parents. Young adults are often drawn to Andrea's positive "can-do" attitude and exuberant personality. Andrea could share her experience with them and perhaps prevent them, early on, from ultimately making the same mistake she did.

Sincerely,

*Reni Coop*

**Reni Cooper**
8313 Linden Oaks Court
Lorton, Virginia 22079
(202) 262-1361

DEFENDANT'S
EXHIBIT
7

September 10, 2007

Honorable Gladys Kessler
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Honorable Judge Kessler,

My name is Ina Ramos and I am a part time graduate student pursuing my doctorate in public health. I also work and teach part time at a local university, Bowie State. I live in Upper Marlboro, Maryland with my husband Selvin.

I have known Andrea Riley, who I met at Sargent Memorial Presbyterian Church, for twenty-five years. Andrea and I met in the youth group, Pamoja, and became instant friends. Although we lived in different areas of Prince George's County, we spent many weekends at each others homes as teenagers and always saw each other in church. Over the years we've sang and worked together in various groups including but not limited to the Sargent Gospel-Aires and Sisters Interacting with Sisters. Andrea was very active in starting a Girl Scout troop, directing the youth choir at Sargent and has always been willing to help with organizing and planning events. Additionally, Andrea is one of my closest friends and we have been involved in each others lives outside of Sargent. Over the years we served as bridesmaids in one another's weddings and I am the God mother to her two daughters.

As stated above, Andrea is the mother of two beautiful daughters and also has a precious granddaughter. She is a wonderful provider who takes great pride in caring for her family. She has always been the primary provider for her family ensuring a nurturing home environment while meeting their daily needs. She encourages her daughters to be active in the community. Her youngest daughter, who recently became a new mother, was on the cheerleading team at her high school and in the youth choir at church. And her oldest daughter participated in the band during high school as well as various church activities including singing, the dance ministry and the step team. Additionally, Andrea has displayed countless acts of kindness to me of which I will share the most memorable example. Four years ago, I became unexpectedly ill and required constant monitoring due to the excruciating pain. During this very difficult time, Andrea spent several hours away from and after work sitting by my side, holding my hand and crying with me. As if that wasn't enough, she and another friend spent numerous hours convincing their OB/GYN provider to assist me although he had not seen me as his patient. I am eternally grateful to Andrea for her support during that difficult time.

I am aware that Andrea has accepted responsibility for her actions and is now awaiting sentencing. If she were to receive the maximum sentence allowable by law, it would absolutely tear her family apart. As previously stated, she is the primary provider for her children and grandchild and they need her as the continued matriarch of their family unit. Therefore, I am asking that you exercise leniency in her judgment. It would be most beneficial to her children, family and friends if she were able to repay her debt to society in the swiftest most just manner possible.

Sincerely,

Ina A. Ramos

DEFENDANT'S
EXHIBIT
8

Honorable Gladys Kessler
U. S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

My name is Yvette Fountain. I'm a Trustee, Usher, Deacon, Church Credit Union
Cashier, Gospel Aires Choir member, ex-Secretary of Presbyterian Women's
Organization and Inactive Youth Leader for Sargent Memorial Presbyterian
Church. Professionally, I work for the DoD as a Human Resources Specialist.

I became acquainted with Andrea Riley Harrington at Sargent Memorial
Presbyterian Church when she was a teenager singing in The Voices of
Tomorrow.

I watched Andrea grow from a teenager, to a young wife, mother and then single
parent. Andrea is a giving parent to her children and the youth of Sargent.  She has
raised two daughters, who have been active at Church. Jate, a current High School
graduate of 2007. Jasmine will be a graduate of 2008. Andrea now sings for the
Gospel-Aires as a member and soloist. Andrea has been an active participant with
the Presbyterian Women's Organization. Andrea has directed the Voices of
Tomorrow (gospel youth group). Andrea has been an active supporter of Pamoja
(youth group), including donations, volunteering to help them in anyway.

I am aware of the crime that Andrea is charged with and has pled guilty. I know
she has taken responsibility for her actions and regrets her actions and wishes
she'd never done it. I've known her to be a responsible, hard working person and
it seems out of character for her. Taking a mother from her home and who is a
single parent would greatly harm her family structure. I ask the court to exercise
leniency on her behalf.

                        Sincerely,
                        *Yvette Fountain*



DEFENDANT'S
EXHIBIT
9

September 15, 2007

Honorable Gladys Kessler
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Honorable Judge Kessler,

My name is Brenda Swann Holmes. I am an Elder at Sargent Memorial Presbyterian Church. I have been a member of Sargent Memorial since 1982 at which time I met Andrea Riley as a teenager. Andrea and my daughter, Ina, became friends and have remained so over the years. Consequently, Andrea has spent much time in my home and she considers me a second Mom and her children call me Grandma.

Andrea has been in my home not only to spend the night with my daughter, but also for Pamoja (Sargent Youth Group) meetings and for Sisters Interacting with Sisters (young female fellowship group) where she acted as one of the young adult leaders. She has been in the Sargent Gospel Choir (Sargent Gospel-Aires) since she was sixteen (16) years of age where she is a soloist along with her daughter. She has volunteered to lead a Girl Scouts troop as well as the Voices of Tomorrow (Sargent Teen Choir). She is always willing to help with church functions.

Andrea has grown over the years from a carefree teenager to a loving mother and now a grandmother. She has brought her children to church and ensured that they participated in the youth programs at Sargent Memorial Presbyterian Church where she herself grew up. Her oldest daughter recently graduated from high school and enrolled in her freshman year of college. Her youngest daughter is a senior in high school as well as a brand new mother. Andrea is providing a home for her daughters and her new granddaughter.

It is unfortunate and disappointing that Andrea is in this legal position, but I am aware that she has accepted responsibility for her actions and is now awaiting sentencing. If she were to receive the maximum sentence allowable by law, it would be detrimental to her daughters and her granddaughter. She is the primary provider for her children and her grandchild and they need her. Therefore, I am asking that you exercise leniency in her sentencing. It would be most beneficial to her children, family, church and friends if she were able to repay her debt to society in the shortest time possible.

Sincerely,

Brenda S. Holmes



Honorable Gladys Kessler
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Honorable Judge Kessler,

My name is Brenda Swann Holmes. I am an Elder at Sargent Memorial Presbyterian Church. I have been a member of Sargent Memorial since 1982 at which time I met Andrea Riley as a teenager. Andrea and my daughter, Ina, became friends and have remained so over the years. Consequently, Andrea has spent much time in my home and she considers me a second Mom and her children call me Grandma.

Andrea has been in my home not only to spend the night with my daughter, but also for Pamoja (Sargent Youth Group) meetings and for Sisters Interacting with Sisters (young female fellowship group) where she acted as one of the young adult leaders. She has been in the Sargent Gospel Choir (Sargent Gospel-Aires) since she was sixteen (16) years of age where she is a soloist along with her daughter. She has volunteered to lead a Girl Scouts troop as well as the Voices of Tomorrow (Sargent Teen Choir). She is always willing to help with church functions.

Andrea has grown over the years from a carefree teenager to a loving mother and now a grandmother. She has brought her children to church and ensured that they participated in the youth programs at Sargent Memorial Presbyterian Church where she herself grew up. Her oldest daughter recently graduated from high school and enrolled in her freshman year of college. Her youngest daughter is a senior in high school as well as a brand new mother. Andrea is providing a home for her daughters and her new granddaughter.

It is unfortunate and disappointing that Andrea is in this legal position, but I am aware that she has accepted responsibility for her actions and is now awaiting sentencing. If she were to receive the maximum sentence allowable by law, it would be detrimental to her daughters and her granddaughter. She is the primary provider for her children and her grandchild and they need her. Therefore, I am asking that you exercise leniency in her sentencing. It would be most beneficial to her children, family, church and friends if she were able to repay her debt to society in the shortest time possible.

Sincerely,

Brenda S. Holmes



DEFENDANT'S
EXHIBIT
11

**HENRIETTA J. ELLIS**
**14546 LONDON LANE**
**BOWIE, MD 20715**
**(301) 352-7522**

September 13, 2007

Clark U. Fleckinger, Esq.
C/o The Honorable Gladys Kessler
U.S. District Court for the District of Columbia
111 Rockville Pike, Suite 980
Rockville, MD 20850

Dear Judge Kessler:

Please acknowledge this as a character letter for Andrea Riley. I have known Andrea for approximately eight years. She and I attend the same Church, sing in the same choir, are on the same board for the Women Ministry and her daughter and I dance in the same dance ministry at Church. Andrea, from the beginning has and always maintains an exuberant spirit which encourages her wonderful personality. Treating her peers and those amongst her with the utmost respect. She is always willing to help someone in need (i.e. taking in young girls in trouble and counseling our young boys in there hardships) with such a big caring heart. She is a mentor to the teens in our church and group leader and founder of S.I.S. (Sisters Interacting with Sisters).

She continues to show and share positive life examples to those around her even during the midst of the storm. She has expressed to me, her family and friends her remorse regarding this current situation, which in knowing her character is unlike her demeanor in everyway. I would say that this cross in her life is one I would never see her do again.

I hope this letter services as a sufficient reference for Ms. Riley.

Sincerely,

Henrietta J. Ellis

**From:** LOVELY DRAE <andrea1214@yahoo.com>
**To:** cufleckinger@aol.com
**Subject:** CHARACTER LETTER
**Date:** Tue, 16 Oct 2007 9:01 am



Honorable Gladys Kessler:

   My name is Danielle Lymore and this letter is in reference to Andrea Riley. I've known Andrea for 7 years and she's like a sister to me. Where I am not proud of the decisions she's made I stand by her in her time of need. In life we all make mistakes and the only thing we can do is truly learn from them and grow because of them. I am not excusing her actions but I know that Andrea has learned from her mistakes. Andrea is the type of person that goes above and beyond for her friends and family. She's always there to lend a helping hand or wipe your tears if need be. She's very active in church and the youth adore her. Her presence is imperative to her immediate family. She is the sole provider for her children and her granddaughter and without her they won't be able to survive. So your honor I ask if you can find it in your heart to give Andrea a second chance. Andrea has asked God for forgiveness and learned the error of her ways. I know all crimes must have a punishment but I simply ask you not to send her to jail or prison. I'm not sure what the alternatives are but I pray that jail or prison is not the outcome. I'll also pray for Mr. Alvord and hope that one day he can find in his heart to forgive her as well. Thank you for time.

                    Sincerely,
                    Danielle Lymore


**Andrea Riley**
**Warm Spirit Consultant**
**warmspiritdrae@yahoo.com**
**Check out my myspace page:**
www.myspace.com/onelovelyone

---

Catch up on fall's hot new shows on Yahoo! TV. Watch previews, get listings, and more!

**From:** LOVELY DRAE <andrea1214@yahoo.com>
**To:** cufleckinger@aol.com
**Subject:** character letter
**Date:** Tue, 16 Oct 2007 2:30 pm



October 16, 2007

To Whom It May Concern:

Andrea Nate Riley and I have known each other for over 15 years. Andrea has been a good friend as well as a sister. Andrea's mother and my father were in a relationship for over 15 years and through their relationship, Andrea and I became friends/sisters.

Andrea is and has been a good mother to her two children. She has a wonderful personality and caring heart. As a single parent she provides a safe and harmonious life for her children and grandchild.

Although, Andrea has been charged with a criminal offense, her focal point is not to focus on this mistake, but to accept it, correct it, with the intention on not revisiting it again. I believe this is what she has done because of her devotion to her children and grandchild.

It is clear that Andrea has understood what she had done, accepted and acknowledges her mistake and is willing to reconcile.

Hence, please take this under consideration when making your decision.

Regards,

Donya Bush


**Andrea Riley**
**Warm Spirit Consultant**
**warmspiritdrae@yahoo.com**
**Check out my myspace page:**
www.myspace.com/onelovelyone

---

Be a better Heartthrob. Get better relationship answers from someone who knows.
Yahoo! Answers - Check it out.


DEFENDANT'S
EXHIBIT
14

**Mitchell H. Hugonnet, Ph.D.**
Clinical & Forensic Psychology
601 Pennsylvania Avenue, N.W.
Suite 900 South Building
Washington, DC 20004
1.866.362.4846
Toll-free Facsimile & Telephone
Email: mitchell.hugonnet@gmail.com

December 10, 2007

Clark U. Fleckinger II
Attorney At Law
Rockville Metro Plaza I
111 Rockville Pike, Suite 980
Rockville, MD 20850
(301) 294-7301
VIA FACSIMILE: (301) 738-5708

Re: U.S. v. Andrea Riley (AKA: Andrea Myles) Case No. 07-CR-161(GK)

Dear Mr. Fleckinger:

Pursuant to your request and with the consent of your client, Ms. Andrea Riley (DOB: 12/14/1970), I conducted a thorough psychological examination of Ms. Riley in preparation for her upcoming sentencing hearing before the Honorable Gladys Kessler on December 19, 2007. This evaluation of Ms. Riley consisted of four face to face examinations at my office for psychological testing and interviews on September 25th, (2 hours) 26th, (2 hours) October 22nd, (1.5 hours) and November 27th 2007, (1.75 hours) lasting in total approximately seven hours fifteen minutes. Additionally I reviewed records associated with this case and carefully examined the results of the psychological testing. The tests, records and procedures for this evaluation are listed below.

Evaluation Procedures:
- Minnesota Multiphasic Personality Inventory, Second Edition, MMPI-2
- Personality Assessment Inventory, PAI
- Millon Clinical Multiaxial Inventory, Third Edition, MCMI-III
- Trauma Symptom Inventory, TSI
- Detailed Assessment of Posttraumatic Stress, DAPS
- Developmental History Questionnaire
- The Forensic History Questionnaire-Revised
- SIMS

Records/Documents Reviewed:
- United States District Court for The District of Columbia Probation Office, Presentence Investigation Reports dated September 5, 2007 and revised on October 3, 2007.
- Defendant's Comments and Objections to the Draft Presentence Investigation Report dated September 20, 2007.

1

### Informed Consent/Confidentiality Waiver:

The defendant was informed about the purpose and non-confidential nature of this evaluation. She was told that copies of this report would be sent to the Court, prosecution and defense attorneys. I informed Ms. Riley that I might be called to testify about my findings. Ms. Riley reported that she understood these conditions and agreed to proceed with the evaluation.

### Mental Status Examination:

Ms. Riley was alert, fully oriented, properly attired for a professional appointment and cooperative with the examination procedures. She was friendly with moods that varied from euthymic to dysthymic depending upon the material discussed; her affect was appropriate and responsive to the material being discussed. She expressed remorse for what she had done and spoke fondly about Mr. Alvord, her former employer throughout the interviews. Her speech was consistent with her level of education, meaningful, spontaneous, grammatical and goal directed. There was no evidence for the presence of psychotic symptoms such as delusional thinking, formal thought disorder or perceptual disturbances (e.g. hallucinations) of any kind. Ms. Riley's attentional capacity was unimpaired and her memory for immediate, recent and remote events was intact. Her judgment and insight were inconsistent. She is concerned about the effects her incarceration will have on her two teenage daughters and recently born grandchild. Although not formally tested, Ms. Riley's intelligence is estimated to be within the average range.

### Results of the Psychological Evaluation:

After carefully reviewing all the information referenced above, I am unable to identify or diagnose any acute or chronic abnormal mental state, illness or defect that would have had any substantial causal or determinative influence upon Ms. Riley's behavior during the period of time that she is alleged to have committed these offenses. The data from this examination did support a current diagnosis of an anxiety spectrum disorder, namely mild Posttraumatic Stress Disorder (typically referred to as PTSD, which appears to have originated during her teenage years and is chronic in nature) but the etiology and effects of this illness appear unrelated to the instant offense. I found no evidence for either manic or compulsive behaviors across several psychological tests and my forensic interviews. Ms. Riley's PTSD engendering experiences have left her vulnerable to frequent periods of feeling tense, insecure, unappreciated and disconsolate; her moods may unpredictably run hot and cold.

Ms. Riley's life history is summarized in the Presentence Investigation Report therefore it will not be reiterated. The early developmental history completed by Ms. Riley's mother was unremarkable except for forceps delivery without negative sequelae. There was nothing in Ms. Riley's history suggesting adverse early developmental factors consistent with any of the impulse control disorders. However, there were several remarkable incidents in Ms. Riley's life history that harmed her psychologically, most notably being coerced into non-consensual sex several times at age 15, suffering spousal abuse for eight years at the hands of her second husband (please see below) and feeling emotionally estranged from her mother since childhood. This evaluation strongly suggests that Ms. Riley is emotionally brittle and she will be at significant emotional risk if she is incarcerated; she will likely require the full spectrum of mental health services in any penal institution in which she is placed. Under stress, her moods can become intense, mercurial and poorly modulated; as such, she is vulnerable to behaving impulsively in a self-destructive manner. At these times, when she is under the sway of dysphoric moods, her judgment becomes impaired and her ability to control or foresee the

2

consequences of her behavior diminishes significantly. Ms. Riley is at mild to moderate risk for self-destructive behaviors including suicide attempts, if she is beset with intense stresses or emotional dysphoria that she cannot cope with.

Ms. Riley has several risk factors for suicide according to the latest summary of research collected by the National Institute of Mental Health. Research shows that risk factors for suicide include:

- Depression and other mental disorders such as PTSD. More than 90 percent of people who die by suicide have these risk factors.
- Stressful life events (solely supporting two children and several adults over eight years, arrest and litigation), in combination with other risk factors, such as mental disorders.
- Family history of mental illness (mother's relatives, aunt, uncles, cousins).
- Family history of substance abuse (father abused drugs).
- Family violence, including physical or sexual abuse (Ms. Riley was sexually abused by an older step-brother five years her senior on four occasions over a two month period when she was 15 years old. She was beaten by her second husband approximately four times a year, punched in her face with his fists, during their eight year relationship).
- Incarceration.
- History of impulsive behavior.

Ms. Riley's PTSD induced emotional vulnerability, chronic since the age of 15, suggests that she is likely to be further damaged by a significant period of incarceration. In the event she suffers further emotional deterioration as a result of her incarceration, it is my opinion to a reasonable degree of professional certainty that Ms. Riley will be less likely to be able to resume her responsibilities and obtain and sustain employment. Please contact me if you have any questions or concerns about this report.

Respectfully submitted by,

Mitchell H. Hugonnet, Ph.D.
Licensed Clinical Psychologist
DC, MD, VA

**DEFENDANT'S
EXHIBIT
15**

# Gannett 401(k) Savings Plan
## Confirmation of Payment

Statement Date: 11–21–2007

000260
ANDREA N. RILEY
3426 55TH AVE.
APT. 102
HYATTSVILLE MD  20784

This statement describes how your **November 20, 2007** distribution from the Gannett 401(k) Savings Plan was paid and provides you with the information you need to calculate the taxes you may owe for the 2007 tax year. Because the legal and tax rules for a payment can be different for each person based on individual circumstances, please consult your attorney or tax advisor for more information.

## Payment Information

### Cash Payment
Your total cash payment was calculated as follows:

| | |
|---|---|
| **Gross Cash Payment** | **$1,904.17** |
| Less Direct Rollover | 0.00– |
| Less Federal Withholding | 380.83– |
| Less Maryland Withholding | 0.00– |
| **Net Cash Payment** | **$1,523.34** |

If your payment was more than $1,000 and $5,000 or less and you did not make an election otherwise, your payment was sent to the IRA listed below. You will receive information from Hewitt Financial Services with details on how to access your account. If you would like more information on accounts and services from Hewitt Financial Services, please call 1–800–890–3200.

## Delivery Information

Your payment was delivered as follows:

| | Cash |
|---|---|
| **To You** | $1,523.34 |

delivered by **Hewitt**

0197400012  G5574–000260



## Additional Information

This payment was made from a plan that is intended to be qualified under section 401(a) of the Internal Revenue Code.

Please retain this statement for your tax records. In **January 2008**, you will receive a Form 1099-R, which will be filed with the federal, and, if applicable, state government, for this payment.

## For More Information

If you need additional information, access the *Your Benefits Resources*™ Web site at **http://www.ybr.com/gannett** or call an Account Representative toll-free at **1-866-343-2333**. Account Representatives are available Monday through Friday, between **9 a.m.** and **5 p.m.**, Eastern time. The automated telephone system is available 24 hours a day, Monday through Saturday, and after **1 p.m.**, Eastern time, on Sunday.

*Your Benefits Resources*™ is a trademark of Hewitt Management Company LLC.



0197400012  G5574-000260

# Gannett 401(k) Savings Plan
## Confirmation of Payment

Statement Date:  11–21–2007

000260
ANDREA N. RILEY
3426 55TH AVE.
APT. 102
HYATTSVILLE MD  20784

This statement describes how your **November 20, 2007** distribution from the Gannett 401(k) Savings Plan was paid and provides you with the information you need to calculate the taxes you may owe for the 2007 tax year. Because the legal and tax rules for a payment can be different for each person based on individual circumstances, please consult your attorney or tax advisor for more information.

## Payment Information

### Cash Payment

Your total cash payment was calculated as follows:

| | |
|---|---|
| **Gross Cash Payment** | **$1,904.17** |
| Less Direct Rollover | 0.00– |
| Less Federal Withholding | 380.83– |
| Less Maryland Withholding | 0.00– |
| **Net Cash Payment** | **$1,523.34** |

If your payment was more than $1,000 and $5,000 or less and you did not make an election otherwise, your payment was sent to the IRA listed below. You will receive information from Hewitt Financial Services with details on how to access your account. If you would like more information on accounts and services from Hewitt Financial Services, please call 1–800–890–3200.

## Delivery Information

Your payment was delivered as follows:

| | Cash |
|---|---|
| **To You** | $1,523.34 |

delivered by **Hewitt**

0197400012 G5574–000260



# Additional Information

This payment was made from a plan that is intended to be qualified under section 401(a) of the Internal Revenue Code.

Please retain this statement for your tax records. In **January 2008**, you will receive a Form 1099−R, which will be filed with the federal, and, if applicable, state government, for this payment.

# For More Information

If you need additional information, access the *Your Benefits Resources*™ Web site at **http://www.ybr.com/gannett** or call an Account Representative toll−free at **1−866−343−2333**. Account Representatives are available Monday through Friday, between **9 a.m.** and **5 p.m.**, Eastern time. The automated telephone system is available 24 hours a day, Monday through Saturday, and after **1 p.m.**, Eastern time, on Sunday.

*Your Benefits Resources*™ is a trademark of Hewitt Management Company LLC.

0197400012  G5574−000260

