UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 07-161 (GK) |
| | : | |
| v. | : | |
| | : | |
| ANDREA MYLES, | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing, recommending that the defendant be sentenced to a total period of incarceration of 30 months, a sentence at the midpoint of the defendant's United States Sentencing Guidelines ("USSG" or "Guidelines") range of 27-33 months. In support thereof, the United States respectfully states the following:

**BACKGROUND**

On May 29, 2007 the defendant pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344. As part of her plea, the defendant agreed that the following facts would have been established beyond a reasonable doubt had this case gone to trial:

The law firm of Alvord and Alvord (hereinafter, "Alvord & Alvord") was created in 1932 by the grandfather and father of Robert W. Alvord ("Mr. Alvord"), who joined the firm in 1958. At all times relevant to the charges in this case, Alvord & Alvord has been located in the District of Columbia, and Mr. Alvord has been a partner at the firm. Additionally, in the late 1930s, Mr. Alvord's father established the Alvord Foundation, which received money from Mr. Alvord's father and later from Mr. Alvord, for the purpose of making charitable contributions to the community. After Mr. Alvord's father passed away in 1964, Mr. Alvord served as a trustee for

the Alvord Foundation and continued its legacy of making charitable contributions to the community. At all relevant times, Alvord & Alvord and the Alvord Foundation maintained separate bank accounts with Bank of America. At all relevant times, Bank of America was a financial institution insured by the Federal Deposit Insurance Corporation.

In 1999, Mr. Alvord underwent two surgeries for cancer, and then underwent chemotherapy treatment from on or about February 2000, through July 2000. During that time, Mr. Alvord was in need of an employee or employees to replace his bookkeeper and secretary, both of whom had left or were in the process of leaving his firm, leaving him with a temporary employee to manage the firm's daily operations. On or about the summer of 2000, Mr. Alvord hired defendant, to fill both positions. At all relevant times, defendant's duties at Alvord & Alvord included but were not limited to answering all telephone calls received by the firm, scheduling appointments for Mr. Alvord, operating the firm's computer system, reviewing and paying bills to the firm's creditors, maintaining the firm's accounting books and records, paying her salary, and completing and filing federal and state tax forms on behalf of the firm, including the withholding of funds from her salary for the payment of her taxes. At all relevant times, defendant was also responsible for overseeing the Alvord Foundation's books and records, and had access to account information and statements from Bank of America pertaining to the Alvord Foundation.

From on or about January 2001 through May 2002, pursuant to her duties as Alvord & Alvord's bookkeeper, defendant completed and filed all of the firm's Internal Revenue Service Form 941 quarterly federal tax returns on behalf of Alvord & Alvord. As indicated by the forms, defendant's salary for the year 2001 was approximately $38,240.

On or about June 2002, defendant knowingly and willfully devised a scheme and artifice to embezzle money from Alvord & Alvord and the Alvord Foundation, including by defrauding Bank of America and M&T Bank of funds entrusted to their custody and care by Alvord & Alvord and the Alvord Foundation, and to convert the money for her own use. For the purpose of executing and carrying out the aforementioned scheme and artifice, defendant did as follows:

On or about June 25, 2002, defendant obtained from Bank of America a debit card issued in her name on the Alvord Foundation's Bank of America account. The debit card was mailed from Bank of America's office located in Charlotte, North Carolina, to Alvord & Alvord's office, where defendant received the card. defendant obtained additional debit cards on the Alvord Foundation's Bank of America account on or about January 22, 2004, and on or about September 15, 2005 (collectively, the "Alvord Foundation debit cards"). At no point was defendant a signatory on the Alvord Foundation's account, and at no point was she authorized by the Alvord Foundation or Mr. Alvord to obtain the Alvord Foundation debit cards. From on or about June 2002, through on or about February 2006, defendant made charges on the Alvord Foundation debit cards, without authorization from the Alvord Foundation or Mr. Alvord, to obtain cash, goods and services for her own personal use. The amount of charges made by defendant and honored by Bank of America on the Alvord Foundation debit cards during the aforementioned period amounted to approximately $114,049.65.

In addition, as part of the operating procedures at Alvord & Alvord, defendant would often approach Mr. Alvord with blank checks and request his signature for the stated purpose of paying Alvord & Alvord's bills. Mr. Alvord signed the blank checks

and provide them to defendant with the expectation that she would complete them for the stated purpose of paying the firm's creditors. In the years 2003, 2004 and 2005, defendant's legitimate salary from Alvord & Alvord was approximately $42,617.60, $47,611.84 and $53,507.58, respectively.

From on or about January 2003 through December 2005, for purpose of executing and carrying out the aforementioned scheme and artifice, defendant fraudulently completed some of the blank checks that Mr. Alvord had signed and made them payable either to herself, or to third party vendors for the purpose of obtaining goods or services for her own personal use. The checks made payable to third parties for her benefit from Alvord & Alvord's Bank of America accounts totaled approximately $12,736.09. The checks defendant made payable to herself from Alvord & Alvord's Bank of America accounts totaled approximately $341,194.34, and were either cashed by her or deposited into her own personal bank account. In addition, defendant fraudulently completed checks signed by Mr. Alvord from Alvord & Alvord's account with M&T Bank, and cashed or deposited the checks into her own personal bank account for her own use. The checks from Alvord & Alvord's M&T Bank account totaled approximately $6,800.00. All of the checks fraudulently completed by defendant were honored by Bank of America and M&T Bank respectively.

For purpose of executing and carrying out the aforementioned scheme and artifice, defendant also fraudulently obtained debit cards from Bank of America on Alvord & Alvord's accounts. At no point was defendant a signatory on Alvord & Alvord's Bank of America accounts, and at no point was she authorized by the Alvord & Alvord or Mr. Alvord to obtain a debit card in connection with Alvord & Alvord's Bank

of America accounts. From on or about January 2004, through on or about December 2005, defendant made charges with the debit cards on Alvord & Alvord's Bank of America accounts, for her own personal use without authorization from Alvord & Alvord or Mr. Alvord. The amount of charges made by defendant and honored by Bank of America on Alvord & Alvord's accounts during the aforementioned period amounted to approximately $11,247.40.

During the course of her employment at Alvord & Alvord, defendant would, at various times, briefly review bank statements with Mr. Alvord. defendant obtained the relevant bank statements in electronic format by email and was able to edit the bank statements in order to conceal the aforementioned fraudulent scheme.

In approximately the late fall of 2005, Mr. Alvord observed several checks at Alvord & Alvord's office that he had signed but that defendant had not mailed to pay Alvord & Alvord's various business creditors for the firm's normal operating expenses. Upon performing a more careful review of the firm's accounts, Mr. Alvord learned that many of the firm's debts to various creditors were long overdue. Mr. Alvord then confronted defendant about her conduct, and terminated her employment with Alvord & Alvord on or about December 2005.

Mr. Alvord later reported defendant's fraudulent activity to the Metropolitan Police Department ("MPD"). On or about May 2006, an MPD detective contacted defendant and informed her of the investigation against her. defendant retained an attorney to assist her in resolving the dispute with Mr. Alvord. On or about May 16, 2006, defendant's attorney sent an email to Mr. Alvord expressing her desire to resolve Mr. Alvord's complaint in a mutually acceptable manner. To that end, the attorney

requested a meeting with Mr. Alvord. After Mr. Alvord declined to accept the invitation for a meeting with her attorney, defendant sent an email to Mr. Alvord on or about May 25, 2006, asking Mr. Alvord to resolve the matter with her short of criminal prosecution by allowing her to make restitution.

## SENTENCING GUIDELINES

A Pre-Sentence Investigation Report ("PSR") was prepared for the defendant. The PSR determined the base offense level to be 7 under USSG §2B1.1(b)(1)(G), with a 12 level increase under USSG § 2B1.1(b)(1)(G) because the offense involved a loss of between $200,000 and $400,000. The PSR further determined that a 2 level enhancement applied for abuse of trust under USSG § 3B1.3. This made the adjusted offense level 19. The PSR then reduced the adjusted offense level by 3 levels due to the defendant's acceptance of responsibility under USSG §§ 3E1.1(a) and 3E1.1(b). The PSR calculated that final total offense level to be 18. The defendant did not have any criminal convictions in her background, establishing a criminal history category of I. Based on the defendant's total offense level of 18 and criminal history category of I, the Guidelines call for a term of imprisonment within a range of 27 to 33 months.

On January 3, 2008 the defendant filed a sentencing memorandum in which she argues, among other things, that the abuse of trust enhancement should not apply with respect to calculating the defendant's total offense level, and that a sentence outside of the Guidelines is appropriate when the factors set forth in 18 U.S.C. 3553(a). Those arguments are addressed below.

**ABUSE OF TRUST**

The defendant argues that the abuse of trust enhancement does not apply to the defendant because she was employed as both a bookkeeper and secretary. That assertion is incorrect.

In United States v. O'Connell, 252 F.3d 524, (1st Cir. 2001), defendant O'Connell was employed by the victim company, Pyramid Textiles ("Pyramid"), as a bookkeeper. O'Connell did not have authority to sign Pyramid checks, but he would prepare them for his supervisor's signature. During a three year period, O'Connell engaged in a scheme to defraud Pyramid by making out checks to himself and forging his supervisor's signature. During that three year period O'Connell stole approximately $723,000. When imposing a sentence, the District Court applied the two point abuse of trust enhancement to O'Connell, and the First Circuit held that application of that enhancement was appropriate because, among other things, O'Connell had unique access as a bookkeeper to Pyramid's line of credit and checking account. Id. at 529.

In United States v. Castro, 46 Fed.Appx. 58 (3rd Cir. 2002), defendant Castro served as the secretary and bookkeeper for the victim company, Fund Securities Incorporated ("FSI"). While employed as the secretary and bookkeeper for FSI, defendant Castro forged checks aggregating in excess of $2 million and deposited them into her personal account. The District Court found and the Third Circuit affirmed that the abuse of trust enhancement applied to defendant Castro because "the position she filled allowed her to commit a difficult-to-detect wrong because the [FSI] relied fully on her integrity to control and maintain the books and cash flow." Id. at 59. See also United States v. Link, 74 F.3d 1242 (7th Circuit 1996) (finding that abuse of trust enhancement

was appropriate when sentencing bank tellers who were also served as bookkeepers because their position gave them considerable responsibility and authority within the victim company).

In this case, the defendant took advantage of her position as the bookkeeper for Alvord & Alvord and the Alvord Foundation, and therefore the abuse of trust enhancement applies.

## SENTENCING RECOMMENDATION

The Government recommends that the Court sentence the defendant to 30 months incarceration, a period within the defendant's Guidelines range. Such a sentence would be reasonable and would also be justified by consideration of the sentencing factors enumerated in 18 U.S.C. § 3553.

The district court should consider all of the applicable factors set forth in Title 18 United States Code, Section 3553(a). See United States v. Gall, _____ U.S. _____, 2007 WL 4292116, at *7 (December 10, 2007). These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. §3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); and the need to avoid unwarranted sentence disparities (18 U.S.C. § 3553(a)(6)).

This sentence is at the mid-point of the defendant's Guidelines range. In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756. Nonetheless, and as the Supreme Court stated earlier this month, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, _____ U.S. _____, 2007 WL 4292116, at *7 (December 10, 2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. See United States v. Rita, ___ U.S. ___, 127 S.Ct. 2456 (2007). See also United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). And the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766-67 (the Sentencing Commission will

continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement – in a fair and uniform way – the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in Gall. See Gall, at * 7.

In this case, over the course of three years the defendant was able to steal approximately $282,000 from Mr. Alvord by diverting checks to her personal account and using the Alvord & Alvord credit cards for her personal benefit. The defendant stole this money to pay for her elaborate, lavish and expensive wedding, and nights out on the town. She used her position as Mr. Alvord's bookkeeper to steal his money, and the money of his charitable foundation. This is money that Mr. Alvord earned over many years of hard work, and this was money that he wanted to go to his children and grandchildren, and to the charities that he has contributed to over these many years. It is also clear that Ms. Myles will never be able to compensate Mr. Alvord for the money that she stole. Therefore, a 30 month period of incarceration is appropriate in this case.

## CONCLUSION

The defendant should be sentenced to 30 months of incarceration, a sentence at the mid-point of the defendant's Guidelines range.

Respectfully,

JEFFREY A. TAYLOR
United States Attorney

_____/s/_____
LOUIS RAMOS
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.  #4243
Washington, DC 20001
Phone: 305-2195; Fax: 616-3782
D.C.  Bar No. 472-176